UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 5:04 MJ 5053 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | O R D E R |
| | ) | (Resolving Docket Nos. 14, 15, 16, |
| | ) | 20, 28, 37, 38) |
| WCI STEEL, INC., | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge James S. Gallas |
| | ) | |

*Expert testimony from Dr. Albers (Docket No. 14)*:

WCI Steel, Inc. [WCI] sought by motion *in limine* to exclude testimony of Dr. Peter Albers offered by the government for the purpose of establishing that remains of 31 birds found at WCI's sludge containment area on May 13, 2002 died of a result of petroleum fouling or petroleum toxicity. The Court held this and several other motions in abeyance to hear the evidence objected to and following trial the Court now issues its rulings.  WCI argues that Dr. Albers' testimony cannot be offered as an expert witness for this conclusion under Evid. R. 702 and 703 because his testimony is unreliable.   See *Kumho Tire v. Carmichael*, 526 U.S. 137, 141 (1999) (Expert testimony must be relevant and reliable).  WCI contends that Dr. Albers' testimony is not based on personal observations or analysis and thus is a mere conduit for reports from third parties.

Dr. Albers opined, "based upon evaluating alternative scenarios, is that these birds basically died of being trapped in this oily material and not being to get out" (TR. 223).  Dr. Albers eliminated other causes of death explaining:

5:04 MJ 5053                                          2

> That could be disease.  That could be accidents and that these bodies
> just happened to be there because they happened to die when they
> were either in or near the pits.  The oil really didn't kill them.  It just
> coated them.  That's one scenario.
>
> I basically eliminated that because the pattern of carcasses that was observed
> is not what I would expect.  If birds were dying naturally or from some
> random disease, I would expect to find evidence of dead birds elsewhere.
> They were only found in these two containment areas that weren't even
> found in the other areas.  So that kind of rules out this sort of a random death
> occurrence from old age and from disease somewhere affecting the birds and
> they're just dropping dead elsewhere.  They were just found there.

(TR. 224).


As WCI argues,  Dr. Albers' reasoning is flawed because the search was focused solely on specific sludge containment area of the 56-inch Hot Mill Lagoon.[1]  There was no effort made to ascertain the presence of dead birds outside these containment areas.  Special Agent Paul Beiriger of the U.S. Fish & Wildlife Service testified that he together with Special Agent Dan Sheill retrieved avian remains upon execution of a search warrant on May 13, 2002 by conducting a "cursory search" of the pits, lagoons  1 through 6 (TR. 26).  The pair, though, turned their attention to retrieval of bird remains from the edges and within several feet of the bank of the 56-inch hot mill lagoon (TR. 24-36). Moreover, as the report from Michael E. Carlson (Defendant's Exhibit G) indicates, carcasses of dead birds or injured birds on land are easy prey for hawks, owls, crows and other scavengers.  Consequently, Dr. Albers' testimony is based on an  unreliable assumption due to the doctor's lack of personal participation in the recovery of the carcasses.  The assumption of a

---

[1] Note that WCI has also moved to exclude evidence from other containment areas, because all allegations in this matter concern avian remains from one area (See Motion Docket No. 16).

5:04 MJ 5053                                    3

lack of other bird remains on land misapprehends the limited nature of the search.  This carries

through to his explanation concerning bird disease, "[t]hey're not going to concentrate anywhere.

They're just going to fall out in a random pattern everywhere and this is what happened on the east

coast where I come from, same phenomenon" (TR. 228-29).  Again there was no complete search

of WCI's premises from which to exclude the possibility of a random pattern rather than a cluster

in the sludge containment area of the 56-inch hot mill lagoon.  Accordingly, WCI's motion *in limine*

to exclude the testimony of Dr. Albers (Docket No. 14) is granted.


*Evidence of Other Alleged Bird Mortalities and Events (Docket No. 15):*

        In this motion *in* limine  WCI seeks to prevent consideration of bird mortalities or events

which allegedly occurred at other facilities on other dates.  These include five unproven charges that

are subject to the subsequent violation notice that the court has already ruled cannot be tried in this

case, and two migratory bird carcasses found in the proximity of the 56-inch hot mill lagoon

subsequent to the May 13, 2002 search.  The motion is focused particularly on the testimony of Ms.

Heather Merritt who in the past employees of WCI had brought oil soaked birds to her in an effort

to rehabilitate them.


        There is not any discernable purpose for her testimony.  An argument could be made that

there is a problem in this case in determining whether the Migratory Bird Treaty Act (16 U.S.C.

§703) has a  *scienter* requirement.  If there were a question over whether or not this is a strict

liability offense, Rule 404(b) allows evidence of other crimes, wrongs or acts to prove the absence

of a mistake or accident.  Ms. Merritt's testimony would be admissible concerning prior incidents

5:04 MJ 5053                                      4

of oil-soaked birds at WCI Steel's plant to establish knowledge. However, the government contends that violations are strict liability offenses. Accordingly, the motion to exclude evidence of other alleged bird mortalities and events is denied  (Docket No. 15).

*Evidence Regarding Facilities Other than the 56-Inch Hot Mill Lagoon (Docket No. 16):*

WCI Steel argues that this case involves only one of its water treatment systems, the 56-inch hot mill lagoon and the two adjacent sludge containment areas number 56A and number 56B. Accordingly it seeks to exclude evidence encompassing the number 5 pond and the former number 6 and 6A ponds.

At the hearing WCI pointed out that the government sought to introduce evidence from pond number 5 in which only a feather was found and no violation was charged.  The court ruled that only the exhibits related to the 56-inch hot mill lagoon was admissible (TR. at 31).  Accordingly the evidence from the other ponds is irrelevant and excluded pursuant to Evid. R. 401 and the motion to exclude such evidence is granted (Docket No. 16).

*Subsequent remedial actions and Jeremy Applegate's Report (Docket Nos. 20, 28):*

As for subsequent events, both the government and WCI Steel have sought to admit this evidence while arguing that the other's evidence is inadmissible.  The court agrees that the post May 13, 2002 evidence is irrelevant and will not be considered in its decision.  Accordingly, the government's motion *in limine* (Docket No. 20) and WCI's motion to exclude subsequent events contained the report of Jeremy Applegate  (Docket No. 28) are granted.

5:04 MJ 5053                                          5

*Motion to Advance Case to Verdict and Motion to Strike (Docket Nos. 37, 38):*

Since there was no jury in this case tried under Fed R. Crim P. 58(b)(1)(F), there can be no Fed. R. Crim. P. 31 verdict.  Also, as WCI Steel points out in its motion to strike, there is no procedural precedent for the government's motion.  Accordingly, the government's motion to advance case to verdict (Docket No. 37) is denied, and WCI Steel's motion to strike (Docket No. 38) is granted.

IT IS OR ORDERED.

s/James S. Gallas
United States Magistrate Judge

Dated: August 3, 2006