UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | Case No. 5:04 MJ 5053 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | |
| **WCI STEEL, Inc.** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | Magistrate Judge James S. Gallas |
| | ) | |

WCI Steel, Inc. ("WCI Steel") owns and operates a 995-acre integrated steel manufacturing

plant located in Warren, Ohio.  A majority of the WCI's premises are surrounded by fencing with

gated entrances and the remainder extends to the natural boundary of the Mahoning River (Shepker

TR. 363, 383).


There are several manufacturing facilities located on these premises, but at issue is the 56"

Hot Mill, which produces steel slabs which are rolled into hot band coils.  Run-off material used in

the 56" Mill manufacturing process flows into a water recycling lagoon.  The run-off is called

"emulsified oil", which contains water, iron oxide, and lubricating oil from the manufacturing

process.  Every few years, the lagoon is dredged and the "sludge" from the bottom of the lagoon is

pumped into sludge pond "A".  Sludge pond "B" is a temporary storage pond used to store excess

sludge from pond "A".


The 56" Hot Mill recycle system was designed in accordance with accepted and reasonable

engineering practices.  It is not unique, and,  in fact, the system is similar to a number of systems

that have been installed and operated in the steel industry throughout the United States. Suspended solids composed of iron oxide scale with attached oil are very typical materials that would be found in any hot mill recycle system.

On May 13, 2002, U.S. Fish and Wildlife Service agents conducted an unannounced search of WCI's wastewater treatment systems, including the 56" Hot Mill recycle system, pursuant to a federal search warrant. The search was prompted by a newspaper article and an interview with Heather Merritt, a federally-licensed wildlife rehabilitator, regarding several oiled birds recovered from WCI Steel's No.5 Pond, which is a separate waste treatment facility from the 56" Hot Mill recycle system.  Fish and Wildlife Service agents searched for avian remains in and around the 56"Hot Mill recycle system and Pond 5.   From the 56"Hot Mill recycle system they recovered the remains of 31 migratory birds, 7 additional non-migratory birds, and 3 bats.  The avian remains were generally partial, for example, at least one was a single bird feather.

The United States on April 16, 2004 charged WCI Steel with 31 counts of violating the Migratory Bird Treaty Act [MBTA] (16 U.S.C. §703) for the "unlawful take of migratory birds" in six violation notices issued by the U.S. Fish & Wildlife Service.  (*Violation Notices Nos. 397759, 397760, 397762, 397764, 397765 and 397766*).   The violation notices were divided by species specifically listing 17 morning doves; 8 ducks; 2 common night hawks; 1 song sparrow; 1 Savannah sparrow; 1 dark-eyed junco; and 1 ring-billed gull.  The violation notices gave WCI Steel the option of appearing in court or terminating the matter by payment of collateral (fine) pursuant to Rule

5:04 MJ 5053                                    3

58(d)(1) of the Federal Rules of Criminal Procedure in the amount of $65,900.00.  WCI Steel opted
to challenge these charges at a bench trial.

At trial Dr. Pepper Trail of the National Fish and Wildlife Forensic Laboratory testified on
the identification process of the avian remains.  Dr. Trail had examined the physical structure and
appearance of the remains for the sole purpose of identifying the remains by species.  Dr. Trail did
not conduct a necroscopy (i.e., autopsy) or any other tests on the remains to determine the cause of
death.  He conceded that his original conclusion that 31 separate birds were found may have been
overstated because a possibility existed that several bird parts were in fact from the same bird.
However, Dr Trail stood by his secondary conclusion that the remains of  28 separate birds were
found.

The government's expert, Dr. Peter Albers, opined that the birds had died due to petroleum
fouling or petroleum toxicity. However, Dr. Albers never visited WCI's Warren Plant and did not
conduct any field or research investigation with respect to cause of death.  In fact, there is no
indication that he even examined the 31 remains.  His knowledge of the Warren Plant and the
relevant events were solely based upon his review of the documents provided by Fish and Wildlife
Service. Dr. Albers acknowledged the possibility that the birds could have died of a variety of
natural causes (e.g., disease or old age) or from toxic exposure at nearby locations.

His opinion is unreliable because it was based on the assumption that, "[i]f birds were dying
naturally or from random disease, I would expect to find evidence of dead birds elsewhere."  (TR.

5:04 MJ 5053                                           4

224).  U.S. Fish and Wildlife Service Agents had focused their search on the sludge containment areas and had not searched for bird remains elsewhere. The testimony was that there had been a "cursory" search of the sludge containment area only. (TR.26)   Dr. Albers testified that fencing would hinder mammalian scavengers (apparently neglecting to consider that the premises were bordered by  the Mahoning River on one side), and based his conclusion on the material provided to him that indicated no sightings of scavenger birds (TR. 225-26, Ex. 14).  He testified that the urban environment would be a poor habitat for scavengers, but in elaborating on that point, contradicted himself by pointing out that urban scavengers such as rats, cats and feral dogs could account for the absence of bird remains elsewhere (TR. 226).

Dr. Albers' opinion was based on the erroneous assumption that the bird deaths were attributable to the lagoon sludge because no bird remains were reported to have been found "elsewhere." First, the agents did not search "elsewhere," but focused on the 56" Hot Mill recycle system, and secondly, Dr. Albers conceded that the absence of bird remains "elsewhere" could be the result of scavenging.

Environmental consultant Michel E. Carlson, for WCI Steel, reported and testified that scavengers such as hawks, owls and crows were present and  would devour bird remains on land (TR. 318-19, Ex. G). He refuted  the government's evidence, explaining that due to the lack of a necroscopy, the evidence  did not eliminate bird deaths by natural causes, as predation or disease prior to their remains falling into the sludge containment areas (TR. 336-338, 341-42, Ex. G).  Mr. Carlson testified regarding several diseases which commonly affect the species of birds at issue,

5:04 MJ 5053                                              5

including trichomoniasis, avian botulism, and West Nile Virus, and that disease could not be eliminated as a possible cause of death in the absence of a necroscopy or other testing of the bird remains.

*Conclusions of Law*:

WCI Steel is charged with "unlawful take of migratory birds."  In order to establish each count charged against WCI, the United States must prove beyond a reasonable doubt that WCI Steel did in fact "take"  at least one protected migratory bird within the meaning of the MBTA, as implemented through 16 U.S.C. § 703.  This section  was enacted as a key part of the Migratory Bird Treaty Act in 1918 to implement a treaty between the United States and Great Britain and provides, in relevant part:

> Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or eggs of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof . . ..

16 U.S.C. §703

"Take" is defined in the MBTA as follows:

For the purposes of this subchapter the word "take" shall be construed to mean pursue, hunt, shoot, capture, collect, kill, or attempt to pursue, hunt, shoot , capture, collect, or kill, unless the context requires otherwise.

5:04 MJ 5053                                6

16 U.S.C. §715n[1]


Birds protected under the MBTA include any native species or family of birds that live, reproduce or migrate within or across international borders at some point during their annual life cycle. The list of MBTA-protected birds includes more than 800 species, many of which are legally hunted as game birds (including mourning doves, mallard ducks, and Canada Geese).  See 50 CFR § 10.13.


Federal decisions are divided and unclear concerning whether activities not directed at migrating birds are penalized by the MBTA.  One side of the spectrum holds that the plain language of the MBTA indicates that the Act proscribes only activities which directly kill or exploit to harm birds, such as hunting, poaching, and trafficking of birds and their parts as in *Newton County Wildlife Ass'n v. United States Forest Service*, involving timber harvesting.  *Id.*, 113 F.3d 110, 115 (8th Cir. 1997), *cert. denied*, 522 U.S. 1108 (1998)("We note that the MBTA's plain language prohibits conduct *directed at* migratory birds– 'pursue, hunt, take, capture, possess' and so forth."); And see *Seattle Audubon Soc'y v. Evans*,952 F.2d 297, 302 (9th Cir. 1991) (The MBTA prohibits "physical conduct of the sort engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918.").  In *Mahler v. U.S. Forest Service*, the court reasoned that logging did not constitute taking when the bird deaths were incidental to human

_____

[1] The Court believes that this expanded definition of "take" in the MBTA negates WCI Steel's argument of prejudicial variance between the charge of "unlawful take" and the evidence presented at trial of bird deaths.

5:04 MJ 5053                                        7

activities not intended to kill or capture birds.  *Id.*, 927 F. Supp. 1559, 1579-80 (S.D. Ind. 1996)

("The words 'take' and 'kill' were used in a context that clearly focused on hunting, trapping, and

poaching.")  Decisions from this side of the spectrum appear to read the MBTA as prohibiting

deliberate molestation of migratory birds. There is, however, no consensus on when the

consequences of human activity are deemed direct or incidental. For example, in *Center for

Biological Diversity v. Pirie*, the court held that military live fire training exercises involved activity

not directed at migrating birds, but the bird deaths were not incidental but a direct consequence.  *Id.*,

191 F.Supp.2d 161 (D.D.C. 2002), *vacated*, 2003 WL 179848(D.C. Cir.2003)(circuit court found

the case mooted by the Bob Stump Defense Authorization Act for Fiscal Year 2003, which amended

16 U.S.C. §703).  Thus, while there was no activity deliberately directed at birds by the military, the

activity was analogous to hunting.


The government urges interpretation from the other side of the spectrum, for  reading the

MBTA consistent with the position found in *U.S. v FMC Corp.*, employing strict liability to the

deaths of birds due to toxic waste in ponds due to pesticide manufacture.  *Id.*, 572 F.2d 902 (2d. Cir.

1978).  There the decision focused on the word "kill," and found liability for incidental deaths as

a result of manufacturing "activity."  *Id.*, 572 F.2d at 907.  The decision distinguished bird deaths

from other causes explaining, ". . . construction that would bring every killing within the statute,

such as deaths caused by automobiles, airplanes, plate glass modern office buildings or picture

windows in residential dwellings into which birds fly, would offend reason and common sense."

*Id.*, 572 F.2d at 905.

5:04 MJ 5053                                      8

Although the decision in *FMC Corp.* refers to "activity," it does not appear to divide actions along active/passive lines.  *FMC Corp.* refers to bird deaths from automobiles and airplanes, so the decision indicates that the MBTA does not penalize bird deaths where the birds themselves participated by flight into the hazard.  Thus the underlying rationale from *FMC Corp*. may be that where the birds themselves could avoid the hazard, there is no "killing," or perhaps a "killing" occurs to birds alight, as opposed to those in flight. *FMC Corp*., consequently, appears to represent a compromise position, but the facts bear strong similarity to the present matter.

A more uncompromising view of the MBTA can be found in  *U.S. v. Corbin Farm Service*, a scholarly attempt to discern whether the MBTA applied to deaths of migratory waterfowl as a result of poisoning from a pesticide sprayed alfalfa field.  The decision allowed no exclusions.  *Id.*, 444 F.Supp. 510 (E.D. Cal. 1978).  The decision focused on the phrase in 16 U.S.C. §703 that, "it shall be unlawful at any time, by any means or in any manner . . ." explaining:

> The use of the broad language . . . belies the contention that Congress intended to limit the imposition of criminal penalties of those who hunted or captured migratory birds.  Moreover, a number of songbirds and other birds not commonly hunted are protected by the conventions and so by the Act; Congress imposed criminal penalties on those who killed these birds as well as on persons who hunted game birds."

*Id.*, 444 F.Supp. at 532.

The decision in *Corbin Farm Service*, incidentally noted a prior successful prosecution for bird deaths caused by oil coating from open oil sludge pits.  *Id.*, 444 F.Supp. at 533; *U.S. v. Union Texas Petroleum*, 73-CR-127 (D. Colo. July 11, 1973), but found no "real precedential value."  The

5:04 MJ 5053                                                9

decision adhered to the view that no *scienter* of intent is required to an act which is "*malum prohibitum*" in that "[t]he accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." *Id.*, 444 F.Supp. at 535-36, citing *Morissette v. U.S.*, 342 U.S. 246, 256, 72 S.Ct. 240, 246, 96 L.Ed. 288 (1952). Presumably then from that court's rationale, auto drivers, airplane pilots and homeowners with picture windows would face prosecution under the MBTA.

In short, the courts have struggled to apply simple language to the universe of human/avian interaction without reaching any consensus.  However, it will not be necessary to do more than a superficial examination of the meaning of and application of 16 U.S.C. §703 in this matter.  Since the government presented the bird death infraction as a criminal matter, it must prove its case beyond a reasonable doubt.  Applying this standard to the evidence presented, the Court has reasonable doubt as to WCI Steel's involvement in the 28 bird deaths.  The evidence shows with certainly only that bird remains were found on WCI's premises. The evidence does not eliminate natural causes of death, based on Dr. Albers' testimony for the government, Mr. Carlson's testimony for WCI and the "cursory search" conducted by the agents (TR. 26). The evidence failed to establish that bird deaths were attributable to WCI Steel.  Consequently, the government has failed to show "unlawful take" of any migratory birds as defined by 16 U.S.C. §715n.

5:04 MJ 5053                                    10

## CONCLUSION

For the foregoing reasons, the Court finds WCI Steel, Inc. not guilty of the violations

charged and dismisses the case.

s/James S. Gallas
United States Magistrate Judge

Dated: August 10, 2006